IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
February 27, 2018 Session

FILED
08/13/2018
Clerk of the
Appellate Courts

## STATE OF TENNESSEE v. WILLIAM H. YOUNG

**Appeal from the Criminal Court for Hamilton County**
**No. 293343    Thomas C. Greenholtz, Judge**

---

### No. E2017-00913-CCA-R3-CD

---

The Defendant, William H. Young, appeals as of right from the Hamilton County Criminal Court's denial of his request for judicial diversion. The Defendant was convicted following a bench trial of criminally negligent homicide, and he was sentenced to eighteen months of supervised probation. On appeal, the Defendant contends that the trial court abused its discretion by relying solely on the circumstances of the offense in its decision to deny judicial diversion to the exclusion of other supporting factors. According to the Defendant, the trial court's decision to deny his request for judicial diversion was based on the offense that he was convicted of rather than the applicable factors. Discerning no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Lee Davis and Janie Parks Varnell, Chattanooga, Tennessee, for the appellant, William H. Young.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and AnCharlene D. Davis and Kristen D. Spires, Assistant District Attorneys General, for the appellee, State of Tennessee.

### OPINION
### FACTUAL BACKGROUND

Based upon the Defendant's involvement in a March 20, 2014 fatal car crash on Highway 58, the Hamilton County Grand Jury charged the Defendant with vehicular

homicide of Donna Marie Giarrusso ("the victim"), reckless aggravated assault of T.G.,[1] and reckless endangerment of the public at large. See Tenn. Code Ann. §§ 39-13-102, -103, -213. The Defendant proceeded to a bench trial in October 2016.

Just before sunrise on the morning of March 20, 2014, at approximately 6:56 a.m., the victim was driving her thirteen-year-old son, T.G., to middle school in her Toyota Camry. She was traveling on Champion Road, as she did daily. T.G. testified that his mother stopped at the intersection of Highway 58, a four-lane divided highway, that twelve to eighteen cars went by before his mother began crossing Highway 58 from Champion Road, and that she was headed for the median towards the northbound lanes. T.G. opined that there "was plenty of time to get through the gap" to the median. However, as they were going across, T.G. looked to his left and "saw these two headlights" before "everything just went black."

Although the speed limit was fifty miles per hour, the Defendant's Dodge Ram approached "very rapidly" from the southbound lanes of Highway 58. When the Defendant realized that the victim was going straight rather than turning right into the southbound lanes, he applied his brakes, skidding ninety-three feet and swerving "really hard" from the right lane towards the left lane in an effort to avoid the crash. According to the Defendant, he was "thinking and hoping and praying to God that she would just stop," but the car did not stop. He claimed that there was no way to avoid the crash.

The Defendant hit the driver's side door of the victim's car, and his Dodge Ram lifted off the ground high into the air, seemingly about to flip over. The airbags in the Camry did not deploy because of the side impact rather than front-end collision. The force of the collision knocked the victim's vehicle 253 feet from the point of impact—crossing multiple lanes, including turning and emergency lanes, the grass median, and the highway shoulder, and coming to rest in a field where a wooden pole that was concreted into the ground with a cable attached to it stopped the car's movement. The driver's side compartment of the victim's car was not visible. The Defendant's truck intruded more than two feet into the victim's car—the passenger doors would not close; the roof was distorted; the front windshield was "crinkled"; and the back window had been knocked out. The Defendant's truck traveled 170 feet after impact and came to rest in the northbound lanes of Highway 58.

According to the Defendant, he got out of his truck, and upon examining himself, he realized that he was "pretty much okay." The Defendant and bystanders went to render aid. The victim's neck appeared broken; her chin was lacerated; and she had no pulse. T.G. was knocked unconscious. He suffered a concussion and required "a lot of stitches" to his head. He also had a "nasty gash" on his leg.

---

[1] It is the policy of this court to protect the identity of minors.

When the police arrived, the Defendant was asked, "[H]ow fast were you going down this hill?" to which he replied, "[A]bout 50, 55 as far as I know. I mean, I [was] just going with the traffic." Days after the accident, the Defendant, in a recorded phone call, told his insurance agent that he was driving about fifty miles per hour prior to the crash, that the victim pulled out in front him, and that he was unable to avoid the accident. The Defendant claimed that he was driving "along with the traffic," but he acknowledged that none of the other cars on the roadway that day were involved in the accident because they were able to stop prior to any impact.

Two crash reconstruction experts, Investigators Joe Warren and Stephen York from the Chattanooga Police Department's traffic division, testified. The last five seconds of the Defendant's movements were recorded on his Dodge Ram's event data recorder. The Camry also had a data recording system. From these event data recordings, the investigators calculated that the Defendant was traveling at eighty-nine miles per hour and the victim at ten or eleven miles per hour prior to impact. The event data recorder from the Defendant's Dodge Ram showed that he was driving at approximately seventy-three miles per hour five seconds before impact; that he then accelerated to around eighty-nine miles per hour by pushing the accelerator to the floor and driving at "100 percent throttle"; and that he applied his brake for the first time only 1.2 seconds before the crash. The Defendant braked for over one second, but when the anti-lock brakes tried to engage, the tires locked up. He hit the victim's vehicle driving at around eighty miles per hour.

Although the event data recorder provided that he was only traveling at approximately seventy-two miles per hour at the time of impact, this was incorrect due to wheel lockup, according to Investigator Warren. Investigator Warren also explained that the "dip" in acceleration reflected on the event data recorder at 2.9 seconds prior to impact was the result of a "shift change" in the transmission, meaning that the Defendant was likely trying to "trick the transmission" into "downshifting" to force further acceleration. Investigator Warren asserted that it would have been difficult for the victim to perceive the Defendant's speed due to the "low-light conditions" that morning, which required headlights. Moreover, the crash would not have occurred if the Defendant had been traveling at the posted speed limit, according to Investigator Warren. He asserted that the Defendant would have been around 330 feet away from the intersection and would have been able to come to a complete stop. Investigator Warren further submitted that, if the Defendant had been driving at sixty-miles per hour, ten miles above the speed limit, he would still have been more than 100 feet away from the intersection when the victim attempted to cross though it.

While Investigator Warren agreed that the Defendant could have been attempting to accelerate around the victim, Investigator Warren opined, "It wouldn't be a choice I

would make, but that is a potential interpretation." He clarified, "I guess it could be an option. I just can't imagine what someone would hope to gain from that." According to Investigator York, the "road evidence" showed that the Defendant was braking and swerving to avoid the crash and not in attempting to accelerate to avoid the victim.

A crash history analysis of this intersection was admitted as an exhibit. The report showed that twenty-four crashes had occurred at this intersection between November 1, 2011, and March 4, 2014, including one fatal accident occurring just seventeen days before this collision. The Defendant testified that he was "very familiar" with Highway 58 and became familiar with the intersection at issue because he drove this route to work every day for two years. He also stated that, "because they had so many situations" in this area, a lane had been added so an individual could "build their speed up going up the hill to merge into traffic." He claimed that he thought the victim was trying to merge into the southbound lanes, not go across the highway, and that he accelerated to allow her to complete this perceived maneuver.

Lenita Jeffers testified at trial that, just prior to the accident, she was traveling in the right lane headed south on Highway 58 when the Defendant "came quickly in between [her] and the [car] in the left lane" before he pulled in front of her in the right lane to pass. According to Ms. Jeffers, there were at least two or three other cars in the left lane at that time. Ms. Jeffers described that the Defendant was "going rapidly" by her down the hill. Although Ms. Jeffers was driving the posted speed limit, the Defendant's speed made her think she was driving "very slow." Furthermore, Ms. Jeffers testified that, when she was at the top of the hill on Highway 58, she saw the victim stopped at the intersection on Champion Road.

Deborah McCoy stated in her 9-1-1 call, "[T]he truck that hit the car was going on [highway] 58 . . . and the car was trying to cross in front and pulled out right in front him." At trial, Ms. McCoy testified that she was in a group of cars traveling down Highway 58 just before the accident. She estimated that she was driving approximately fifty-five to sixty miles per hour as she was coming down the hill in the right lane when the Defendant passed her. The Defendant did not change lanes again before the collision. Ms. McCoy averred that she had no concerns about the Defendant's driving at that time, believing that "he was driving his car safely and with the proper . . . due regard for the other drivers" around him. According to Ms. McCoy, the Defendant's truck was very close to the intersection when the victim tried to cross it, and "the gap was too little for someone to try and make that entry onto Highway 58[.]" She further testified that she did not see the victim stop at the stop sign on Champion Road. Ms. McCoy also did not believe that there was anything the Defendant could have done to avoid the accident.

Heather Randolph called 9-1-1 and reported, "There was just a wreck on Highway 58 and Champion Road, a car just pulled out in front of a truck." At trial, Ms. Randolph

-4-

testified that "traffic was pretty heavy" when "all of the sudden" the victim "just started out" across the intersection. She explained, "I don't even know that the truck saw the other car pull out. It happened fast and that late." Ms. Randolph further stated that she thought the Defendant was "[t]raveling with the flow of traffic," that she did not believe he was speeding, and that there was nothing he could have done to avoid the crash. She further opined that she did not observe any reckless or dangerous driving by the Defendant that morning.

Also, Heidi Andress called 9-1-1: "It was a white car that pulled out of Champion Road in front of a truck going down Highway 58. It pulled off of Champion Road in front of him and he was going straight." At trial, Ms. Andress testified, "The truck was way too close to that car for that car to feel like they, in my opinion, were going to make it." Ms. Andress said that the victim did not come to a complete stop before proceeding through the intersection. Ms. Andress also asserted that she always tried to "pay attention" at this "dangerous" intersection because people frequently pulled out across Highway 58 from Champion Road often causing accidents. According to Ms. Andress, she did not observe any dangerous, risky, or reckless driving by the Defendant that morning, and she did not think he was speeding. She believed that the Defendant's "driving was reasonable and safe under the circumstances as [she] observed them" that day.

Quanda Little stated that she was driving northbound on Highway 58 that morning when she observed the victim fail to come "to a complete stop" before proceeding across Highway 58. Ms. Little explained that the victim's car "just shot out." She opined that the Defendant was traveling at "a regular speed," that his speed was not concerning to her, that he "was keeping up with traffic," and that the victim's actions were "unsafe." Ms. Little did not think that there was anything the Defendant could have done to avoid the crash. In addition, Ms. Little stated that she had just moved to the area and had seen cars frequently cross that intersection without stopping. Ms. Little said she asked her coworkers about the intersection, and they instructed her to "be careful in that particular area."

Pamela Barnes testified that traffic was "real, real heavy" on the morning of March 20, 2014. The accident had already occurred when she passed through the intersection and stopped to assist. She saw that the victim's car "was smoking really bad," and she was afraid that it was going to catch on fire. Ms. Barnes thought the Defendant appeared "very sincere" as he attempted to help the victim and T.G. Ms. Barnes said that the Defendant told her "that the car pulled out in front of him."

The Defendant presented proof that the victim had suffered from a pink eye infection about a week before the accident. However, the State called the victim's husband, who was living in Louisiana at the time of the accident, in rebuttal. Mr.

Giarrusso testified that his wife did not inform him of any illness, including any pink eye infection.

After the conclusion of proof, the trial court found the Defendant guilty of criminally negligent homicide as a lesser-included offense of vehicular homicide and acquitted the Defendant of reckless aggravated assault and reckless endangerment. See Tenn. Code Ann. §39-13-212. The following facts were adduced at the sentencing hearings held on January 25, and April 11, 2017. The Defendant's biographical information in the presentence report reflected that he had been married for twenty-eight years, that he had six brothers, that he had obtained a college degree in nuclear engineering technology, and that he was employed with the Tennessee Valley Authority ("TVA") doing mechanical maintenance from 2001 until his arrest at work on these charges, which caused him to seek early retirement. The Defendant reported no major health problems and no substance abuse of any kind. He also stated that his childhood was "great" and that "he was raised by a family who loved the Lord and loved helping people." According to the presentence report, the Defendant's criminal record included two speeding tickets and one citation for following too closely.

The presentence report also contained the Defendant's November 22, 2016 statement regarding the incident. In the six-page, typewritten letter written after trial and in preparation for sentencing, the Defendant detailed his premature birth; his early family life, during which he was taught "many spiritual values"; his early medical difficulties, including a hernia and "a heart problem"; and the power of "divine healing" that cured his ailments. He then chronicled his middle school history, including the loss of a friend due to his win in competitive running and how the desegregation of schools affected him. He continued with a recount of his time in high school, including his acceptance of Jesus Christ as his savior and his disdain for using alcohol or illegal drugs. Furthermore, the Defendant relayed that, at the age of twenty-two, he began his service as a minister. Next, he detailed how he met his wife, went to college, and obtained employment with the TVA, including his on-the-job dedication to safety. After providing his life history, the Defendant described the car crash as follows:

> So, on March the 20th, 2014, on my way to work, I had no unsafe practices as I drove to work that morning. Every step that morning was to ensure that I and any other motorist could go to their destination. Many vehicles that morning passed by me and some didn't, which are the ones that stopped at the light with me. The light changed for us to proceed, I was in the left lane as we approached the top of the hill with a car on my right side. I proceeded pas[t] the vehicle on the right to get in the right lane so that I would be in the correct lane as I approached the three-lane section near, what is now the Animal Clinic on Highway 58. Continuing down the

hill right before getting to the off-ramp, I noticed a car approaching the intersection. My first thought was that it was going southbound because of how fast it was moving. So, then I checked my mirror and accelerated because of [a] car near my blind spot. This was to move back to the left lane and allow the vehicle to merge going southbound. When I looked back from checking my mirror is when I noticed the car wasn't going southbound but crossing the highway towards the median. I slammed on [my] brakes trying to stop, hoping the car would stop and I could possibly miss the car, even if I had to go in the median to do so; but would be able to avoid a collision. The driver crossing the highway didn't appear to notice my vehicle, or the situation, and continue to come forward. I called out to God to protect me because I didn't see any other action that I could have done to avoid a collision.

Next, the Defendant detailed his behavior after the accident in helping the victims despite his own injuries, rude behavior by a police officer following the crash, his retention of a lawyer upon his release from the hospital, how his injuries affected his ability to work, and his arrest at work in front of his co-workers. The Defendant then made the following declarations:

Later I talked to [my attorney] and asked him what was going on. He told me that they had evidence from my black box indicating I was traveling at an excessive[ly] high speed (90 mph). I said there was no way that I was traveling that fast. I asked what did her black box report of her doing. He stated that the investigators had reported that her vehicle didn't have a black box. . . . I realized . . . that the investigation had been only to find things concerning what I may have done to incriminate me. [My attorney] filed a motion to request that the other vehicle's black box report be submitted and the 911 witnesses be found. The report came back showing a starting speed of 24 mph going to zero. Then, witnesses stated in court that she had run the stop sign, and all that time I had been trying to figure out what happened that morning. . . . It wasn't until after this accident, that I was made aware of how dangerous that section of Hwy 58 was at Champion Road. . . . So, I am now looking at 5 seconds of my life, a 3 second decision to accelerate and change lanes another second to remove my feet from the gas to the brakes, and 0.70 second to impact of a vehicle crossing into oncoming traffic. During that little glitch of time in my life, trying to do what I thought would help avoid a collision, is now determining my whole future. Beyond the hurt and trauma of a life being lost that day, I know I'll never forget what happened. There have been so

many questions left unanswered, but none of them will heal the suffering and the trauma the two families experienced that tragic morning.

There were also five victim impact statements written by the victim's family members that were attached to the presentence report—one from the victim's husband and son, one from her daughter, one from her sister, one from her father, and one from her mother. Therein, they detailed the impact the victim's death had on each of them, and their contempt for the Defendant given his excessive speed that morning and his lack of acceptance of responsibility.

Also made an exhibit to the sentencing hearing were twelve character reference letters written on behalf of the Defendant. Letters were submitted by his wife, his sister-in-law, his TVA foreman, two fellow TVA employees, a fellow church member, a family-member who was a police officer, a long-time friend, his brother, several school system employees, a United Parcel Service worker, and a pastor. The various letters extolled the Defendant's virtues as a husband, worker, Christian, and friend.

The victim's husband, Chris Giarrusso, testified that he met the victim when she was twenty years old, that they had been together for thirty-four years prior to her death, and had one son, T.G., who was in the car with the victim. Mr. Giarrusso thought about his wife constantly and had difficulty sleeping after the accident, and his friends feared that he might try to kill himself. In addition, Mr. Giarrusso described T.G.'s injuries from the collision: "[H]e was hit on the left side of his head. . . . He had a head concussion. He was in intensive care. He had . . . a nice abrasion on his leg. He still has a scar from it." According to Mr. Giarrusso, the impact of the accident on T.G. "ha[d] been intense," and even three years later, T.G. was still very angry and unable to talk about the accident or go to counselling. Moreover, T.G. was concerned that Mr. Giarrusso might also be involved in a car crash and called Mr. Giarrusso incessantly.

In addition to T.G., the victim had a daughter from a prior marriage, Jennifer Turea. Ms. Turea lived in Louisiana and had three children of her own. According to Mr. Giarrusso, the family was moving to Louisiana so the victim could be closer to her grandchildren. Due to this crash, Ms. Turea had lost both of her parents in car accidents. Furthermore, the victim's parents were "still . . . in deep depression about" the loss of their daughter, and they also lost another daughter to breast cancer a year and half after the crash.

Regarding the intersection where the crash occurred, Mr. Giarrusso said,

So, I mean it affected me thinking how you can kill somebody driving 90 miles an hour when you know [its] a 50-mile-an-hour speed zone coming down a hill. And [the Defendant] said he knew, he did it every day. I told

my wife and I told myself coming down that hill, you know, you be careful.
And . . . I just . . . don't understand it.

Mr. Giarrusso also thought that the Defendant was lying at trial when he said he was driving fifty miles per hour before the crash. Mr. Giarrusso further testified that the "hardest part" of trial was hearing the Defendant's speaking with the insurance agent and the insurance agent's having to ask the Defendant if anyone was hurt. Additionally, Mr. Gairrusso noted that the Defendant had never apologized, and he thought that the Defendant's receiving diversion was "ridiculous."

The Defendant's wife of twenty-eight years, Marthel Ireta Young, testified. Although the couple never had any children of their own, they had "a close, extended family," including "devout parents," multiple siblings, and nieces and nephews. They also attended church on a regular basis and "always, always cared for others." Mrs. Young described the Defendant as a "man of God" that was beloved by his family and as a compassionate, dependable, balanced, anchored, honest, trustworthy, and caring individual. She maintained that the Defendant "did not hesitate to minister to others in their hour of need" and that the Defendant's word was "his bond." In addition, she averred that the Defendant did not drink alcohol or smoke and did not use profanity or raise his voice. According to Mrs. Young, their lives had been "very peaceable[,] [v]ery spiritual, and very connected to the Lord."

Regarding this accident, Mrs. Young said that the Defendant had "completely" cooperated with the investigation. The Defendant told her,

He never saw the car. Why would a car just pull out. He said, I didn't even see it coming. It just came from out of nowhere. . . . I was going down the road with the rest of traffic and then this car came out from nowhere. And it wouldn't stop. He said, it just wouldn't stop. And all I could do was say, Jesus.

She remarked, "[T]his has been a very devastating tragedy that has touched all of our lives in such a devastating way." She continued, "We don't know why this has happened. We have been just devastated by it. We're so sorry about what has happened. He has wept. And he has been crushed by this." According to Mrs. Young, the Defendant had changed after the accident and had become "very reserved." Mrs. Young also opined that the Defendant was remorseful, explaining, "I know he is remorseful in the fact that if he had to do it all over again, he said, I don't know what I could have done differently because the car just kept coming."

Michelina Ralston testified that she was employed by the State of Tennessee, working in the probation arena. She complied a "Risk and Needs Assessment" of the

Defendant, which report was admitted as an exhibit. The Defendant's "risk level" for re-offense was determined to be "low." In the report, it was stated, among other things: "Subject accepts responsibility for his/her behavior."; and "Subject is taking specific steps toward changing his/her lifestyle." When asked how the Defendant was changing his lifestyle, Ms. Ralston replied that an option had to be selected and that was "the most suitable" because the Defendant "indicated nothing that . . . demonstrate[d] that he's not taking positive steps toward change."

After hearing all of the testimony and the trial court's concerns about the Defendant's remorse and acceptance of responsibility, the Defendant testified. He told the court that, given the opportunity, he would say to Mr. Giarrusso, "I am so very sorry that this happened to cost your wife [her] life. I had no intention for this to happen. I know it's a loss to him, a loss to his family, a loss to his friends. And I'm just sorry for it. And I see my part in it. I accept my part in it." When asked what was his part, the Defendant responded,

> That I was driving that vehicle, and at the time I was driving I didn't feel like I was doing what they say I was doing. It was new to me, the vehicle's new to me. Maybe I didn't understand the feel versus my old vehicle. But I'm not arguing against what's been said against me.

He asserted that he had only been driving the vehicle for two days before the accident. He continued, "I'm doing everything safe. I mean, I just didn't think I was doing anything wrong. And at this point of making a judgment that I thought was the correct judgment turned out to be the wrong judgment."

The Defendant agreed that the victim was "dead because of [his] actions[.]" He also claimed that he was saddened by his inability to help T.G. or to reach out to the Giarrusso family. The Defendant exclaimed, "How did we get to this part where for five seconds of a day it ruined two families . . . [?] Why[?] I can't sleep at night. . . . I did this. If I had not been there, this wouldn't have happened." The Defendant described, "It's a true tragedy."

On cross-examination, the Defendant was asked about his November 22, 2016 letter. He explained that he wrote the letter thinking that he was supposed to talk about himself and how he felt about the situation.

After hearing the evidence and the arguments of the parties, the trial court assessed the applicable enhancing and mitigating factors and sentenced the Defendant to eighteen months for his Class E felony conviction. The trial court also denied the Defendant's request for judicial diversion. In denying the Defendant's request for judicial diversion, the trial court reasoned as follows:

However, being qualified for judicial diversion is not the same as being entitled to it, and the appellate courts have held that this [c]ourt instead should look to the factors identified in both State [v.] Parker and State [v.] Electroplating cases . . . , which focus on the defendant's amenability to correction, the circumstances of the offense, the defendant's criminal record, including unconvicted criminal behavior[,] [t]he defendant's social history, the defendant's physical and mental health, the deterrence value to the defendant and others then to whether judicial diversion would serve the ends of justice essentially meaning whether it's in the interest of the public as well as the interest of the accused.

The trial court then assessed each factor "one at a time for purposes of the record[.]" Regarding the Defendant's amenability for correction, the trial court found that it did "not believe" that the Defendant would commit additional offenses or that the Defendant was "a menace to society." However, the trial court was concerned with the Defendant's acceptance of responsibility and lack of remorse because of the Defendant's "own view of the matter":

I believe he thinks that the accident occurred because [the victim] pulled out in front of him, not because he was otherwise doing anything wrong. . . . [The Defendant] does not believe he was speeding at the time, and the [c]ourt is just having trouble with that, candidly.

. . . . The [c]ourt does believe fundamentally that you are remorseful at least about the circumstances in which you find yourself and probably as to the harm that the family has suffered. The [c]ourt really wonders still whether that recognition is a recognition on your part that would be similar to the scientific evidence in this case that suggested that had you been going the speed limit you would have stopped 50 feet short even if [the victim] had been parked in the middle of the lane. . . .

I don't think there's been that level of acceptance of responsibility[.]

Ultimately, the trial court concluded, "[O]n balance, I think amenability of correction probably weighs . . . positively or at worse neutrally in the analysis."

Next, the trial court considered the circumstances of the offense, noting as "positive factors" that the Defendant rendered aid to the victims even though he was injured himself, which reflected "a selflessness and a concern for others[,]" and that the Defendant's behavior was "likely a result of an isolated instance and not part of a longstanding, continuous pattern of reckless driving." Turning to the "negative factors," the trial court found that "the nature of the offense [was] horrendous in itself," remarking

-11-

that multiple victims were present, including the victim's son; that there was "[u]ndisputed evidence from the event data recorder that shortly prior to the time of the collision the throttle was at 100 percent," meaning "that the gas pedal quite l[i]terally [was] to the floor of the truck" while the Defendant was traveling downhill; the Defendant's speed was approaching ninety miles per hour in a fifty-miles-per-hour zone; that the crash occurred during low-light conditions at a time of day that the highway was "heavily traveled"; that there was "[u]indisputed evidence" that, had the Defendant "not been traveling in excess of the speed limit[,] the accident would not have occurred"; and "[t]he nature of the intersection itself[,]" where "there had been numerous other collisions or incidents" and a prior fatal crash had occurred in that same month. Considering "all of those circumstances together," the trial court concluded that the circumstances of the offense weighed heavily against diversion.

The trial court next determined that the Defendant's lack of a criminal record "undoubtedly" weighed in his favor "because it show[ed] a strong likelihood that [the Defendant] [was] not likely to reoffend." The trial court also decided that the Defendant's social history weighed in his favor, noting that the Defendant had a "strong employment history" with the TVA, that he had obtained a college degree, that he had been married for over twenty-eight years, that he attended church and was "active in the ministry[,]" and that there was no history of alcohol or drug abuse. Regarding the Defendant's mental and physical health, the trial court found that there were "no issues that would prevent [the Defendant] from fulfilling the terms and conditions of probation," so that factor was considered to be neutral.

Next, the trial court assessed the deterrence value to the Defendant and to others. The trial court noted that there was "less of a need . . . for specific deterrence" in this case because the Defendant testified that "he's much more careful now in driving" and the validated risk and needs assessment report indicated that the Defendant's "conduct [had] changed." Concerning the need for "general deterrence," the trial court noted the "dangerousness of that intersection." The trial court concluded that deterrence was neutral in this case but that, "if it were weighed at all," it would weigh negatively against the Defendant, though "only very slightly."

Finally, in assessing "whether judicial diversion would serve the ends of justice including the interest[s] of the public as well as the interest[s] of the accused," the trial court remarked that diversion was almost always in the best interests of the accused, as it was here. Regarding the public's interests, the trial court noted that the Defendant was "charged with a more serious offense," which could be considered despite the presence of reasonable doubt. The court concluded that the interests of the public weighed negatively against diversion.

-12-

The trial court then restated the weight it was assigning each of the seven factors and denied diversion. The trial court granted the Defendant's request for an alternative sentence, placing him on supervised probation. The Defendant now appeals, challenging only the denial of judicial diversion.

ANALYSIS

According to the Defendant, the trial court abused its discretion in denying judicial diversion because relying heavily on the circumstances of the offense was not supported by the record. The Defendant submits that the trial court erred by crediting the data from the event data recorder recovered from the Defendant's vehicle over the contradictory eyewitness testimony that the Defendant was not "driving at an excessive speed" but was driving "safely and appropriately on Highway 58" when "the victim pull[ed] out in front" of him. He maintains that

> [t]here is more than one way to understand the few seconds of information found on the event data recorder[.] . . . One view is that the [D]efendant accelerated down the hill with criminal negligence. Another is that the [D]efendant saw the victim pull out in front of him and reflexively tried to accelerate around the car but then hit the brakes just before impact.

The Defendant concludes, "Because the event data recorder is limited to a few seconds before a crash and witnesses saw events over a much longer period of time, rejection of witness testimony was error in the resulting denial of diversion."

In addition, the Defendant asserts that there was no evidence to support the trial court's finding "that the [D]efendant knew of the dangerousness of the intersection." According to the Defendant, "[i]t is logical to assume that motorists living in this area, who travel from the side street daily [i.e., the victim], would be in a better position to be aware of the danger posed than vehicles traveling inbound on Highway 58." The Defendant continues: "That a fatal crash occurred at this same intersection a month earlier, contrary to the trial court's conclusion, is a factor that supports the [D]efendant's request for diversion, not diminishes it"; and "If something is inherently dangerous about this intersection, that weighs in [the Defendant's] favor, as it is outside his control, especially if there is no proof that he was aware of the danger."

In summation, the Defendant states that the "same proof that supported a conviction," i.e. "the circumstances of the offense," was also relied upon by the trial court in denying diversion. According to the Defendant, "[t]he proof required to persuade the trial court that the circumstances of the offense here are sufficient to grant diversion appears to be proof of actual innocence, an impossible standard for any defendant to meet." Finally, the Defendant argues that the circumstances of the offense in this case

-13-

are not "especially violent, horrifying, shocking, reprehensible, offensive or otherwise of an excessive or exaggerated degree," citing State v. Trotter, 201 S.W.3d 651, 654 (Tenn. 2006), to outweigh all other factors.

The State responds that the trial court did not abuse its discretion. According to the State, "[t]he record supports the trial court's ultimate determination that the circumstances of the offense, the public['s] interest[s], and the need for deterrence combined to justify denial of judicial diversion." The State surmises, "[t]he court looked beyond the [D]efendant's criminally negligent speed and relied on more than just the circumstances of the offense to deny diversion."

There is no dispute that the Defendant was eligible for judicial diversion. See Tenn. Code Ann. § 40-35-313(a)(1)(B). However, simply because a defendant meets the eligibility requirements does not automatically entitle him or her to judicial diversion. State v. Bonestal, 871 S.W.2d 163, 168 (Tenn. Crim. App. 1993). "Traditionally, the grant or denial of judicial diversion has been left to the sound discretion of the trial court." State v. King, 432 S.W.3d 316, 323 (Tenn. 2014). When deciding whether judicial diversion is appropriate, a sentencing court must consider seven common-law factors in making its determination. Those factors are:

> (a) the accused's amenability to correction, (b) the circumstances of the offense, (c) the accused's criminal record, (d) the accused's social history, (e) the accused's physical and mental health, and (f) the deterrence value to the accused as well as to others. The trial court should also consider whether judicial diversion will serve the ends of justice—the interests of the public as well as the accused.

State v. Electroplating, Inc., 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998) (citing State v. Parker, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996)); see also King, 432 S.W.3d at 326 (reaffirming that the Electroplating requirements "are essential considerations for judicial diversion"). The trial court must weigh the factors against each other and explain its ruling on the record. King, 432 S.W.3d at 326 (citing Electroplating, 990 S.W.2d at 229). If the trial court adhered to these requirements, "the determination should be given a presumption of reasonableness on appeal and reviewed for an abuse of discretion." Id. at 319. This court will "not revisit the issue if the record contain[ed] any substantial evidence supporting the trial court's decision." Electroplating, 990 S.W.2d at 229; see also Parker, 932 S.W.2d at 958.

A trial court is "not required to recite all of the Parker and Electroplating factors when justifying its decision on the record in order to obtain the presumption of reasonableness." King, 432 S.W.3d at 327. However, "the record should reflect that the trial court considered the Parker and Electroplating factors in rendering its decision and

-14-

that it identified the specific factors applicable to the case before it." Id. If the trial court "fails to consider and weigh the applicable common law factors, the presumption of reasonableness does not apply and the abuse of discretion standard . . . is not appropriate." Id. "In those instances, the appellate courts may either conduct a de novo review or . . . remand the issue for reconsideration." Id. at 328.

Here, the trial court extensively considered all of the Parker and Electroplating factors and explained on the record which factors it relied upon in denying the Defendant's request for judicial diversion. Therefore, the trial court's decision is entitled to the presumption of reasonableness, and this court must affirm that decision if there is any evidence to support it. See King, 432 S.W.3d at 327.

Initially, we conclude that the record belies the Defendant's claim that the trial court's decision to deny his request for judicial diversion was based solely on the offense that he was convicted of rather than the applicable factors. Instead, the trial court placed great weight on the circumstances of the offense. The trial court found that "the nature of the offense [was] horrendous in itself," specifically addressing the presence of two victims in the car, the Defendant's actions leading up to the collision, and the prevalence of accidents at that intersection. The trial court relied on evidence from the event data recorder "that shortly prior to the time of the collision the throttle was at 100 percent," meaning "that the gas pedal quite l[i]terally [was] to the floor of the truck" while the Defendant was traveling almost ninety miles per hour downhill in a fifty-miles-per-hour zone. Also, the trial court observed that the crash occurred during low-light conditions at a time of day that the highway was "heavily traveled." According to Investigator Warren, the accident would not have occurred except for the Defendant's traveling at an excessive speed.

The Defendant's Dodge Ram lifted off the ground high into the air as it collided with the victim's Camry, and his truck appeared to be about to flip over. The force of the collision knocked the victim's vehicle 253 feet from the point of impact. The Defendant's truck intruded more than two feet into the victim's car—the passenger doors would not close; the roof was distorted; the front windshield was "crinkled"; the back window had been knocked out; and the driver's side compartment of the victim's car was not visible. T.G. was originally knocked unconscious, and he suffered a concussion, required stitches to his head, and had a gash in his leg.

The Defendant argues that the trial court erred by crediting the data from the event data recorder recovered from the Defendant's vehicle over the contradictory eyewitness testimony. However, the appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given the evidence . . . are resolved by the trier of fact." State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). The trial court, as trier of fact at sentencing hearings, has the

opportunity to observe the manner and the demeanor of the witnesses, and this court gives great weight to the determinations made by the trial court concerning the credibility of the witnesses unless the evidence contained in record clearly preponderates against them. State v. Raines, 882 S.W.2d 376, 383 (Tenn. Crim. App. 1994).

The trial court credited the evidence from the event data recorder in the Defendant's vehicle, the testimony of the accident reconstruction experts, and several eye witnesses, including T.G. Furthermore, Ms. Jeffers testified that she was driving fifty miles an hour when the Defendant passed her and that his speed made her think that she was driving very slow. The Defendant passed several vehicles and changed lanes multiple times before colliding with the victim. There was testimony at trial that the victim stopped at the stop sign before proceeding into the intersection. Both experts said that she was only traveling ten or eleven miles per hour at impact. T.G. opined that his mother had "plenty of time to get through the gap." Because the evidence does not clearly preponderate otherwise, we will not disturb the trial court's credibility determinations on appeal.

Additionally, the trial court concluded that the general deterrent effect of the sentencing decision weighed "very slightly" against granting the Defendant judicial diversion because of the "dangerousness of that intersection." The Defendant claims on appeal that he was not aware of the dangerousness of the intersection notwithstanding his own trial testimony that he was "very familiar" with Highway 58 and familiar with this intersection passing through it daily for over two years on his way to work. The Defendant went so far as to say that, "because they had so many situations" in this area, a lane had been added so an individual could "build their speed up going up the hill to merge into traffic." According to the trial court, there had been numerous "other collisions or incidents" at the intersection, and a fatal crash had occurred previously in the month. The crash history analysis introduced at trial supported this finding. Also, several witnesses testified at trial that they were familiar with the intersection because it was so dangerous.

Next, regarding whether diversion would serve the interests of the public, the trial court determined this factor weighed negatively against the Defendant because he could have been charged with a more serious offense. See, e.g., State v. Cory Willis, No. W2008-02720-CCA-R3-CD, 2010 WL 3583961, at *5 (Tenn. Crim. App. Sept. 15, 2010) (noting as a proper consideration when taking into account the public's interests). The Defendant was originally charged with three offenses with a mens rea of recklessness, including charges for the injuries suffered by T.G. and endangering the public at large, but the trial court found him only guilty of negligent behavior. There was ample proof for the trial court to consider the Defendant's behavior leading to the original charges even though the trial court determined that they were not established beyond a reasonable

doubt. "[F]acts relevant to sentencing need be established only 'by a preponderance of the evidence and not beyond a reasonable doubt.'" State v. Cooper, 336 S.W.3d 522, 524 (Tenn. 2011) (quoting State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000)).

Finally, while the trial court did find that the Defendant was amenable to correction and that this weighed in favor of granting diversion, the trial court was concerned with the Defendant's failure to accept responsibility for his behavior and his lack of remorse. See State v. Joseph W. Denton, No. M2009-02546-CCA-R3-CD, 2010 WL 4069264, at *5 (Tenn. Crim. App. Oct. 19, 2010) (determining that a defendant's lack of remorse or refusal to accept responsibility for his or her actions relates to the amenability to correction and is an appropriate factor to consider in deciding whether to grant or deny judicial diversion) (citations omitted). The Defendant did not believe he was speeding at the time of the accident, and he maintained that he was operating his vehicle in a safe manner that morning. The Defendant consistently focused on the victim's actions rather than his own despite evidence that, had he been going the speed limit, the accident would not have occurred. Also, the victim's family members were distraught by the Defendant's failure to admit that he was speeding, and they adamantly opposed his request for diversion. See State v. Dennis Miller, No. M2016-02302-CCA-R3-CD, 2017 WL 4582047, at *4 (Tenn. Crim. App. Oct. 13, 2017) (holding that the trial court, in its decision to deny judicial diversion, was entitled to consider the victim impact statement as it reflected on the circumstances of the offense (citing State v. Blackhurst, 70 S.W.3d 88, 95 (Tenn. Crim. App. 2001) (noting that a victim impact statement could be considered reliable information relevant to the nature or circumstances of the offense or any other sentencing consideration))).

As such, we conclude that there was substantial evidence supporting the trial court's denial of the Defendant's request for judicial diversion. The Defendant is not entitled to relief. See, e.g., State v. Daniel T. Maupin, No. M2016-01483-CCA-R3-CD, 2017 WL 4331053, at *10 (Tenn. Crim. App. Sept. 28, 2017) (affirming the denial of judicial diversion in a criminally negligent homicide case where the trial court placed particular importance on the circumstances of the offense and the defendant's lack of hesitation in committing a crime when the risk to human life was high, given the defendant's conduct in creating a high risk to others by operating a large commercial vehicle on a busy highway with insufficient sleep and after taking a non-prescribed medication and a narcotic drug, and where the trial court also expressed the need for deterrence to others and found that confinement was necessary to avoid depreciating the seriousness of the offense).

CONCLUSION

In consideration of the foregoing and the record as a whole, the judgment of the trial court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE